IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:07-CV-198-BR

| | |
|---|---|
| SOBERINA TRAYWICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| FIRST CITIZENS BANK & TRUST ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Plaintiff has filed a response and defendant has replied. Accordingly, this matter is ripe for disposition.

**I. BACKGROUND**

In 1999, plaintiff Soberina Trawick, an African-American woman, began working for defendant, First Citizens Bank & Trust Company ("Bank"). (Compl. ¶ 6). In October 2001, plaintiff applied for a position at the Bank's North Hills location. (Id. ¶ 8). She was not selected for that position because, according to her supervisor, Shan Teel, plaintiff did not "fit the image" of the North Hills location. (Id.). Instead, a Caucasian female was hired for that position. (Id.). After plaintiff complained to the Bank's Regional Executive, Ed Willingham, Teel informed plaintiff that he would promote her to a position at the Bank's Cameron Village location. (Trawick Aff. ¶ 6; Trawick Depo. pp. 35-36). From October 2002 until her termination from employment, plaintiff worked as a Business Banker II at the Bank's Cameron Village location. (Compl. ¶ 9).

As a Business Banker II, plaintiff was initially supervised by Marc Horgan, a Caucasian male. (Traywick Aff. ¶ 8). In April 2005, plaintiff complained to the Bank's Triangle Area

Executive, Christine Young, that Horgan was harrassing her and discriminating against her. (Id. ¶ 9). Young, a Caucasian female, responded that she (Young) was "just like him" and asked plaintiff why she was complaining to Young. (Id.). In April 2006, Teel replaced Horgan and again became plaintiff's supervisor. (Teel Depo. p. 21). Prior to leaving his position, Horgan gave plaintiff an excellent performance evaluation, indicating that she had exceeded expectations. (Trawick Aff. ¶ 11, Ex. A).

From January 2000 until her discharge, plaintiff participated in fund raising efforts for the Raleigh Chamber of Commerce on behalf of the Bank. (Compl. ¶ 12; Trawick Aff. ¶¶ 13, 14). As part of her fund raising efforts, plaintiff would contact bank customers to solicit donations. (Shaw Aff. ¶¶ 3, 7). As a reward for their efforts, the Chamber paid participants monetary commissions for donations solicited and, if a certain amount of donations was achieved, the participants qualified for a Chamber-sponsored vacation. (Id. ¶ 4). On or about 19 May 2006, Michael Shaw, the Bank's team leader for the 2006 Chamber Drive, contacted plaintiff and told her that she had not raised enough donations to qualify for the Chamber-sponsored trip to the Cayman Islands. (Compl. ¶ 12; Trawick Aff. ¶ 20). Shaw informed plaintiff that he would credit her with sufficient Chamber donations from the Bank to qualify her for the trip if plaintiff paid $600 to the Bank out of the $1600 plaintiff received in commissions from the Chamber.[1] (Compl. ¶ 12; Shaw Aff. ¶¶ 8, 9). In prior years, the Bank had allocated its own donations to qualify plaintiff for the Chambers sponsored trips, but had not asked for money from plaintiff in return. (Compl. ¶ 12). On 25 May 2006, plaintiff routed a $600 money order to Shaw through the Bank's internal courier service. (Compl. ¶ 13). Shaw later returned the money order to plaintiff after she was terminated. (Shaw Aff. ¶ 11).

---

[1] Plaintiff contends that Shaw asked for $600 in cash, and when she sent a money order instead of cash, the Bank began an investigation. (See Trawick Aff. ¶ 21; Compl. ¶¶ 12-14).

2

In late May 2006, the Bank's Manager of Investigative Services, Lisa Lee, met with Shaw to discuss discrepancies Shaw had found on plaintiff's Chamber reports. (Lee Aff. ¶ 4). Subsequently, Lee began an investigation of plaintiff's Chamber reports as well as loan documents for customers serviced by plaintiff. (Id. ¶¶ 4, 6). The investigation included interviews with plaintiff, as well as some of the Bank's customers, who had loans with the Bank, serviced by plaintiff. (Id. ¶¶ 8, 15, 18; Compl. ¶ 15). Plaintiff was questioned about Chamber donations allegedly made by the Bank's customer, R & H Produce Company, Inc. ("R & H"). (Lee Aff. ¶¶ 9-11; Compl. ¶ 15). Specifically, plaintiff had recorded donations from R & H in the amount of $2000 that R & H denied making. (Lee Aff. ¶¶ 5, 9, 15, 16). Plaintiff contends that she inadvertently debited R & H's account for $500 that R & H had not authorized. (Compl. ¶ 15). During the course of the investigation, Lee also discovered that certain signatures on loan documents related to the Foot and Ankle Associates of N.C. ("FAA") were forged. (Id. ¶ 16; Lee Aff. ¶¶ 12, 13). Plaintiff provided handwriting samples to Lee, which were examined by a handwriting expert hired by the Bank. (Lee Aff. ¶¶ 12, 14). The expert opined that plaintiff had forged the signatures on the FAA loan documents. (Id. ¶ 14). Plaintiff denied any forgery or wrongdoing. (Compl. ¶ 16).

Following her investigation, Lee made a recommendation to Kay Bailey, the Bank's Senior Human Resources Consultant, that plaintiff's employment be terminated. (Lee Aff. ¶ 20; Compl. ¶ 17). Bailey in turn recommended plaintiff's termination to Area Executive Young and plaintiff's supervisor Teel, both of whom ultimately decided termination was appropriate. (Teel Aff. ¶ 8; Young Aff. ¶ 8). On 26 June 2006, Bailey informed plaintiff that she was being discharged for misappropriation of customer funds and falsification of loan documents. (Compl. ¶ 17).

3

Following plaintiff's termination, the Bank extended an offer of employment to fill plaintiff's position to Tetelia Blount, an African-American female. (Teel Aff. ¶ 11; Hardister Aff. ¶ 4). Blount declined the offer, citing personal reasons. (Teel Aff. ¶ 11; Hardister Aff. ¶ 5). The Bank ultimately hired Matt Robinson, a white male, to fill plaintiff's position. (Teel Aff. ¶ 11; Hardister Aff. ¶ 6).

On 5 October 2006, plaintiff filed a charge of race and sex discrimination with the EEOC. (Compl. ¶ 22). Following receipt of her Notice of Right to Sue on 31 January 2007, (Compl. ¶ 23), plaintiff timely initiated this lawsuit on 27 April 2007 in Wake County Superior Court. In her complaint, plaintiff alleges race discrimination by her employer in violation of 42 U.C.S. § 2000e-2 ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and N.C. Gen. Stat. § 143-422.2 ("N.C. Public Policy"). (See Compl. ¶¶ 21-38). On 31 May 2007, defendant removed the action to this court.

## II. DISCUSSION

**A. Standard of Review**

A motion for summary judgment is appropriate where the moving party can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue as to a material fact is "genuine," when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). In making its determination, the court may look at the pleadings, discovery material, and any affidavits submitted by the parties. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. The court must construe all facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 254.

## B. Race Discrimination

### 1. Framework for Analysis

Each of plaintiff's claims under Title VII, § 1981, and N.C. Public Policy involve the same alleged discriminatory conduct as outlined in the facts above. Both § 1981 and N. C. Public Policy use the same analysis that the courts have established for Title VII claims, see Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (§ 1981); North Carolina Dept. of Correction v. Gibson, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983) (N.C. Public Policy); accordingly, the court will address plaintiff's claims under the Title VII analysis.

To establish a *prima facie* case of wrongful termination based on race, plaintiff may either present direct or circumstantial evidence of a discriminatory motive or she may use the burden shifting analysis set forth by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). Holland v. Wash. Homes, Inc., 487 F.3d 208, 213-14 (4th Cir. 2007). Plaintiff has not alleged any direct or circumstantial evidence of discriminatory motive; therefore, under the burden shifting analysis, plaintiff must show that: (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) at the time of the adverse employment action, plaintiff was performing satisfactory work that met her employer's legitimate job expectations; and (4) following plaintiff's termination, defendant hired a similarly qualified applicant outside plaintiff's protected class to fill the vacancy. Id. at 214.

Once plaintiff has established this *prima facie* case of race discrimination, the burden of production shifts to defendant to show a legitimate, non-discriminatory reason for plaintiff's termination. Id. (citing Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004)(en banc)). Once defendant has produced evidence of a legitimate reason, the burden shifts back to plaintiff to prove that defendant's proffered reason is merely a pretext for discrimination. Id. Plaintiff may demonstrate pretext "by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

### 2. Plaintiff's *Prima Facie* Case

The Bank concedes that plaintiff has established the first two elements of her *prima facie* case– that she is a member of a protected class and that she suffered adverse employment action when she was terminated. However, it argues that plaintiff has failed to show that at the time of her termination, she was performing her work in a satisfactory manner that met the Bank's legitimate expectations. The court agrees that plaintiff has not established this element.

Although it is undisputed that plaintiff had an exemplary career while working at the Bank, at the time of her termination, she was under investigation for forgery and misappropriation of funds. The Bank's Code of Ethics indicates that dishonest or fraudulent acts, including forgery and falsification of documents, will not be tolerated. (Def.'s Mem., Ex. 16). Further, plaintiff's deposition provides support for the Bank's belief that plaintiff had not been truthful with Lee during the investigation. (See Traywick Depo, pp. 129, 136 (plaintiff admitted that the information she gave Lee during the investigation was "very confusing" and "incorrect")). While plaintiff disputes the outcome of the investigation, there is sufficient evidence to show that the Bank reasonably believed

that plaintiff had committed wrongdoing and therefore was not performing her job in a satisfactory manner.

Furthermore, although plaintiff is technically able to meet the fourth element of showing that following her termination, her position was filled by a similarly qualified individual outside her protected class, an additional factor vitiates any inference of discrimination. While the Bank ultimately filled plaintiff's vacancy with a Caucasian male, the position was first offered to an African-American female, Tetalia Blount. (Teel Aff. ¶ 11; Hardister Aff. ¶¶ 4, 5). Only after Blount declined the offer, on 21 August 2006, did the Bank offer the position to Matt Robinson. (Teel Aff. ¶ 11; Hardister Aff. ¶¶ 5, 6). Therefore, any inference of discriminatory motive due to the hiring of Robinson, is eliminated by the Bank's initial offer of employment to Blount. See Powell v. Rumsfeld, No. 00 C 5208, 2001 U.S. Dist. LEXIS 18874, at *13-14 (N.D. Ill. Nov. 14, 2001) (in employment discrimination case, although individual who was ultimately hired to fill plaintiff's vacancy was outside plaintiff's class, offer of employment was initially extended to individual within plaintiff's class, vitiating inference of discrimination).

### 3. Evidence of Pretext

Even assuming that plaintiff has met the elements of a *prima facie* case of race discrimination, the Bank has provided a legitimate nondiscriminatory reason for plaintiff's termination– its belief that plaintiff had forged documents and misappropriated funds– and plaintiff is unable to prove that this reason is merely a pretext for discrimination. In analyzing the Bank's reason for terminating plaintiff, it is not within the province of the court "'to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" Hawkins v.

PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)).

The affidavits and deposition testimony show that the Bank conducted a comprehensive investigation into the alleged forgery and misappropriation of funds. One of the Bank's decision-makers, Christine Young, indicated her regret at having to terminate plaintiff's employment because plaintiff had been such an outstanding employee. (Young Aff. ¶¶ 4, 9). In fact, just two months prior to her termination, plaintiff had received a salary increase. (Id. ¶ 5, Ex. A). Additionally, plaintiff's supervisor, Teel, who was involved in the termination decision, had previously promoted plaintiff and routinely given her very positive evaluations. (Traywick Depo., pp. 196-97; Teel Aff. ¶ 5). This past positive interaction with plaintiff by the decision makers belies any inference that the Bank's reason for termination is pretextual. See Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996) (court noted a "powerful inference" that employer's failure to promote plaintiff was not based on discriminatory motive because individual who failed to promote plaintiff was same individual who hired plaintiff)).

Plaintiff's primary argument appears to be that the investigation was conducted unfairly and that the Bank was simply attempting to "build a file" against her. (Plf.'s Mem. at 13). However, plaintiff's many years of stellar performance do not support this assertion. While plaintiff may disagree with the wisdom or fairness of the investigation and decision to terminate her, such disagreement does not show pretext. See Holland, 487 F.3d at 212-13, 215 (summary judgment for defendant employer affirmed where employer believed plaintiff, who had complained of race discrimination, had made threats to supervisors despite plaintiff's denial of such threats and contention that employer's reason for termination was pretexual); Hawkins, 203 F.3d at 279-80.

8

For the reasons set forth above, defendant's motion for summary judgment is **GRANTED**.

This 25 June 2008.

_____
W. Earl Britt
Senior U.S. District Judge

ST/FCB/MKM